34 F.3d 1356
 Scott DAY, Treasurer of IMPACE-MEA; IMPACE-MEA, a Political
Fund; Steve Frazier, a Minnesota taxpayer and contributor
to IMPACE-MEA; Richard Kimbler, a taxpayer and an
Independent Republican candidate for Secretary of State, Appellants,
v.
John L. HOLAHAN, Jr., in his capacity as Chair of the
Ethical Practices Board, or his successor, Appellee.
MINNESOTA CITIZENS CONCERNED FOR LIFE, INC., Appellant,
Jacqueline A. Schwietz, individually and as Treasurer of
Minnesota Citizens Concerned for Life Committee
for State Pro-Life Candidates; Eileen
Angell, Plaintiffs,
Mitchell Hoyt Unruh; Lori Erickson, Appellants,
v.
John L. HOLAHAN, Jr., in his capacity as Chair of the
Ethical Practices Board; Hubert H. Humphrey, III,
in his capacity as Attorney General of
the State of Minnesota, Appellees.
MINNESOTA CITIZENS CONCERNED FOR LIFE, INC., Plaintiff,
Jacqueline A. Schwietz, individually and as Treasurer of
Minnesota Citizens Concerned for Life Committee
for State Pro-Life Candidates, Appellant,
Eileen Angell; Mitchell Hoyt Unruh; Lori Erickson, Plaintiffs,
v.
John L. HOLAHAN, Jr., in his capacity as Chair of the
Ethical Practices Board; Hubert H. Humphrey, III,
in his capacity as Attorney General of
the State of Minnesota, Appellees.
MINNESOTA CITIZENS CONCERNED FOR LIFE, INC.; Jacqueline A.
Schwietz, individually and as Treasurer of Minnesota
Citizens Concerned for Life Committee for State Pro-Life
Candidates; Eileen Angell; Mitchell Hoyt Unruh; Lori
Erickson, Appellees,
v.
John L. HOLAHAN, Jr., in his capacity as Chair of the
Ethical Practices Board; Hubert H. Humphrey, III,
in his capacity as Attorney General of
the State of Minnesota, Appellants.
 Nos. 94-2387, 94-2388, 94-2390 and 94-2587.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 4, 1994.
Decided Sept. 1, 1994.
 
 Harley M. Ogata, St. Paul, MN, argued for Scott Day in No. 94-2387 (Eric R. Miller, on the brief).
 Frank J. Walz, Minneapolis, MN (argued), for Jacqueline A. Schwietz in No. 94-2390 (Caryn S. Glover, on the brief).
 James Bopp, Jr., Terre Haute, IN (argued), for Minnesota Citizens in No. 2388 (John K. Abegg, on the brief).
 Joceyln Furtwangler Olson, St. Paul, MN, argued for appellee.
 Before BOWMAN and LOKEN, Circuit Judges, and STEVENS,* District Judge.
 BOWMAN, Circuit Judge.
 
 
 1
 These consolidated appeals and a cross-appeal challenge the District Court's decision granting summary judgment for and against the appellants and cross-appellees on various constitutional challenges to sections of the campaign reform laws enacted during Minnesota's 1993 legislative session. We granted expedited review of the District Court's orders. Having reviewed de novo the decision to grant summary judgment (there are no disputed issues of fact), we now affirm in part and reverse in part, and remand to the District Court.
 
 
 2
 IMPACE-MEA is the registered political fund of the Minnesota Education Association, and Scott Day is treasurer of the fund. Steve Frazier is a contributor to IMPACE-MEA and Richard Kimbler is a candidate for Minnesota secretary of state. We will refer to these appellants (plaintiffs below) collectively as IMPACE.
 
 
 3
 Minnesota Citizens Concerned for Life, Inc., is a nonprofit corporation organized under Minnesota law. Mitchell Hoyt Unruh intends to be a candidate for the Minnesota House of Representatives this year (presumably by now that intent is a reality) and to be bound by the applicable Minnesota campaign finance and ethics laws. Lori Erickson was a candidate for the Minnesota Senate in 1990 and 1992, plans to run again in 1996, and likewise intends to be bound by applicable state law. We will refer to these appellants (plaintiffs below) collectively as MCCL.
 
 
 4
 Appellant and cross-appellee Jacqueline A. Schwietz (a plaintiff below) is treasurer of Minnesota Citizens Concerned for Life Committee for State Pro-Life Candidates (MCCL-CSPC), a political fund. Cross-appellee Eileen Angell (a plaintiff below) is a contributor to MCCL-CSPC.
 
 
 5
 Appellee and cross-appellant John L. Holahan Jr. (a defendant below) is chairman of the Minnesota Ethical Practices Board,[1] which is responsible for the administration, interpretation, and enforcement of the statutes at issue in this case. Appellee and cross-appellant Hubert H. Humphrey III (a defendant below) is Minnesota Attorney General. We will refer to Holahan and Humphrey, collectively or individually, as the state.
 
 I.
 A.
 
 6
 Among the 1993 changes and additions to the Minnesota campaign finance and ethics laws was this provision directed to independent expenditures:
 
 
 7
 Independent expenditures; limits increased. (a) The expenditure limits in this section are increased by the sum of independent expenditures made in opposition to a candidate plus independent expenditures made on behalf of the candidate's major political party opponents, other than expenditures by an association targeted to inform solely its own dues-paying members of the association's position on a candidate.
 
 
 8
 (b) Within 48 hours after receipt of an expenditure report or notice required by section 10A.20, subdivision 3, 6, or 6b, the board shall notify each candidate in the race of the increase in the expenditure limit for the candidates against whom the independent expenditures have been made.
 
 
 9
 (c) Within three days after providing this notice, the board shall pay each candidate against whom the independent expenditures have been made, if the candidate is eligible to receive a public subsidy and has raised twice the minimum match required, an additional public subsidy equal to one-half the independent expenditures. The amount needed to pay the additional public subsidy under this subdivision is appropriated from the general fund to the board.
 
 
 10
 Minn.Stat. Sec. 10A.25 subd. 13 (Supp.1993).
 
 
 11
 IMPACE, Schwietz, and MCCL make several constitutional challenges to this statute. Because we hold that it violates the First Amendment, we do not reach the other constitutional issues raised.
 
 
 12
 The District Court concluded that section 10A.25 subd. 13 was content-neutral and was not restrictive of speech (the latter conclusion making the first irrelevant), and ended its analysis there. We think the District Court took too narrow an approach in considering whether section 10A.25 subd. 13 restricts speech and whether the restriction is content-based, and therefore erred in holding that the First Amendment was not implicated.
 
 
 13
 Under Chapter 10A of the Minnesota Statutes, an independent expenditure is defined as "an expenditure expressly advocating the election or defeat of a clearly identified candidate," but one made neither with the consent or authorization of the candidate nor at his request or suggestion. Id. Sec. 10A.01 subd. 10b (Supp.1993). Once any individual, political committee, or political fund makes (or becomes obligated to make) an independent expenditure of more than $100 on behalf of any candidate, or against any candidate, the following scenario is mandated by section 10A.25 subd. 13:
 
 
 14
 The candidate whose defeat is advocated (or whose opponent's election is encouraged) by the independent expenditure has her own expenditure limits increased by the amount of the independent expenditure. Id. Sec. 10A.25 subd. 13(a). The Minnesota Ethical Practices Board then must pay her, if she is eligible to receive a public subsidy and has raised two times the minimum amount required for a match, an additional public subsidy equal to one-half the amount of the independent expenditure.[2] Thus, by advocating a candidate's defeat (or her opponent's victory) via an independent expenditure, the individual, committee, or fund working for the candidate's defeat instead has increased the maximum amount she may spend and given her the wherewithal to increase that spending--merely by exercising a First Amendment right to make expenditures opposing her or supporting her opponent. Thus the individual or group intending to contribute to her defeat becomes directly responsible for adding to her campaign coffers. To the extent that a candidate's campaign is enhanced by the operation of the statute, the political speech of the individual or group who made the independent expenditure "against" her (or in favor of her opponent) is impaired.
 
 
 15
 It is clear that independent expenditures are protected speech. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression...." Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam).[3] It is equally clear that section 10A.25 subd. 13 infringes on that protected speech because of the chilling effect the statute has on the political speech of the person or group making the independent expenditure. As the potential "independent expenders" allege in their briefs (and as at least one sponsor of the legislation intended[4]), the mere enactment of section 10A.25 subd. 13 already has prevented many if not most potential independent expenditures from ever being made. The knowledge that a candidate who one does not want to be elected will have her spending limits increased and will receive a public subsidy equal to half the amount of the independent expenditure, as a direct result of that independent expenditure, chills the free exercise of that protected speech. This "self-censorship" that has occurred even before the state implements the statute's mandates is no less a burden on speech that is susceptible to constitutional challenge than is direct government censorship. See City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 757-58, 108 S.Ct. 2138, 2144, 100 L.Ed.2d 771 (1988).
 
 
 16
 Our conclusion that the most fundamental of rights is infringed by section 10A.25 subd. 13 does not end our inquiry, however. We now must decide whether the statute is content-neutral or content-based, "not always a simple task." Turner Broadcasting Sys., Inc. v. FCC, --- U.S. ----, ----, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). But that determination is critical, as it controls the level of scrutiny we apply in assessing whether the infringement results in a constitutional violation. Having reviewed the teachings of the Supreme Court on this subject and applied them to this statute, we conclude that section 10A.25 subd. 13 is content-based.
 
 
 17
 Section 10A.25 subd. 13 singles out particular political speech--that which advocates the defeat of a candidate and/or supports the election of her opponents--for negative treatment that the state applies to no other variety of speech. See Burson v. Freeman, --- U.S. ----, ----, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992) ("Whether individuals may exercise their free-speech rights near polling places depends entirely on whether their speech is related to a political campaign. The statute does not reach other categories of speech...."). We have no difficulty concluding that this is a statute that "by [its] terms distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed," and thus it cannot be content-neutral. Turner Broadcasting, --- U.S. at ----, 114 S.Ct. at 2459. Independent expenditures of any other nature, supporting the expression of any sentiment other than advocating the defeat of one candidate or the election of another, do not trigger the statute's limit-increasing and money-shifting provisions. We are bound to "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." Id.
 
 
 18
 Notwithstanding the content-based infringement on protected constitutional rights perpetrated by section 10A.25 subd. 13, the statute may be upheld as against constitutional challenge if the state can show that it is narrowly drawn to serve a compelling state interest. See Boos v. Barry, 485 U.S. 312, 321, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988). We hold that the state has made no such showing.
 
 
 19
 The state's professed interest "is the goal of enhancing the public's confidence in the political process by ensuring the viability of the legislature's statutory scheme designed to encourage candidates to accept the voluntary campaign expenditures [sic] of section 10A.25 and the accompanying public subsidies." Brief of Appellee/Cross-Appellant at 23. While this may be a noble goal, we are not certain it is a sufficiently "compelling" interest to justify the burden that the statute imposes upon speech. We do not decide that issue, however, because we hold that, with candidate participation in public campaign financing nearing 100% before enactment of section 10A.25 subd. 13, the interest, no matter how compelling in the abstract, is not legitimate.
 
 
 20
 In 1988, eighty-nine percent of candidates for the Minnesota House of Representatives agreed to spending limits. State of Minnesota Ethical Practices Board, Ethical Practices Board Issues Summary of 1992 Campaign Finance Reports for State Candidates, Political Committees, and Political Funds 2 (July 2, 1993). In 1990, the total for all state candidates was ninety-six percent, and in 1992--still before the enactment of the campaign reform legislation challenged here--ninety-seven percent of the state legislative candidates filing for office agreed to abide by spending limits in order to receive a public subsidy.[5] Id. Clearly, the campaign reform legislation was not necessary to encourage candidates' involvement in public campaign financing, as participation was approaching 100% before the new campaign finance laws were passed in 1993.[6] One hardly could be faulted for concluding that this "compelling" state interest was contrived for purposes of this litigation.
 
 
 21
 Moreover, it occurs to us that no statute that infringes on First Amendment rights can be considered "narrowly tailored" to meet the state's purported interest in these circumstances. Surely the three percent of non-participants could be brought in by means less burdensome to constitutional rights--assuming that group can be brought in at all. In any event, we have our doubts that this statutory scheme would achieve much success in increasing candidate participation in public campaign financing, when the chances of picking up the "bonus" subsidy are so remote. A candidate cannot qualify for the additional subsidy unless particular speech is made against her (or in favor of her opposition) by others who, as we noted above, are discouraged from exercising their rights to so speak by the very same statutory scheme that provides for the bonus subsidy. We have no doubt that section 10A.25 subd. 13 is assuredly not "necessary to serve the asserted interest." Burson, --- U.S. at ----, 112 S.Ct. at 1852 (1992).
 
 
 22
 Even if we were to hold that the statute is content-neutral and thus "pose[s] a less substantial risk of excising certain ideas or viewpoints from the public dialogue," Turner Broadcasting, --- U.S. at ----, 114 S.Ct. at 2459, we nevertheless would conclude that it violates the First Amendment even examining it with the less exacting scrutiny required when the infringement on speech is content-neutral.
 
 
 23
 A content-neutral statute will survive a First Amendment challenge if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at ----, 114 S.Ct. at 2469 (quoting United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)). Regardless of whether or not the asserted governmental interest in instilling public confidence in the election process is "substantial," section 10A.25 subd. 13 cannot logically be characterized as "essential" to furthering the state's interest. As discussed above, no more than an additional three percent of all candidates could be brought into the public campaign financing scheme (given that ninety-seven percent already participate). Therefore, even if section 10A.25 subd. 13 were content-neutral, the statute's negative impact on political speech must be a violation of the First Amendment rights of those who wish to make the independent expenditures at issue. The statute's burden on First Amendment rights does not satisfy strict, intermediate, or even the most cursory scrutiny.
 
 
 24
 We remand to the District Court with instructions to enter judgment for the plaintiffs on this issue and to permanently enjoin the implementation of section 10A.25 subd. 13 of the Minnesota Statutes.
 
 B.
 
 25
 IMPACE and Schwietz also challenge the companion independent expenditure reporting and notice statute, Minn.Stat. Sec. 10A.20 subd. 6b (Supp.1993), as unconstitutionally vague and overbroad. We do not consider those arguments, as we conclude that section 10A.20 subd. 6b cannot stand in light of our holding that section 10A.25 subd. 13 is unconstitutional.
 
 
 26
 The Minnesota campaign ethics law provides detailed requirements for the reporting of election campaign expenditures, including independent expenditures, separate and apart from those found in section 10A.20 subd. 6b. See Minn.Stat. Sec. 10A.20 (1992 & Supp.1993). Therefore the requirements of section 10A.20 subd. 6b may be redundant in serving any legitimate purpose and thus unconstitutionally burdensome even if section 10A.25 subd. 13 were constitutionally sound. See Brown v. Socialist Workers '74 Campaign Comm., 459 U.S. 87, 92, 103 S.Ct. 416, 420, 74 L.Ed.2d 250 (1982) (noting "three government interests sufficient in general to justify requiring disclosure of information concerning campaign contributions and expenditures: enhancement of voters' knowledge about a candidate's possible allegiances and interests, deterrence of corruption, and the enforcement of contribution limitations") (footnote omitted). But section 10A.25 subd. 13 violates the First Amendment, and subdivision 6b of section 10A.20 is directed exclusively to independent expenditures, clearly for the purpose of implementing subdivision 13 of section 10A.25. With section 10A.25 subd. 13 declared unconstitutional, the state cannot "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest." Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 546, 83 S.Ct. 889, 894, 9 L.Ed.2d 929 (1963). We hold that section 10A.20 subd. 6b is not severable from section 10A.25 subd. 13. Because the latter subdivision is unconstitutional, the former subdivision also must fall.
 
 
 27
 We remand to the District Court with instructions to enter judgment for the plaintiffs on this issue and to enjoin permanently the enforcement of section 10A.20 subd. 6b of the Minnesota Statutes.
 
 II.
 
 28
 MCCL argues that the District Court erred in granting summary judgment to the state on MCCL's challenge to three provisions of Minnesota's fair campaign practices law that concern corporate political contributions, Minn.Stat. Sec. 211B.15 (Supp.1993).
 
 
 29
 MCCL contends that the subdivision prohibiting corporations from making independent expenditures to promote the election or defeat of a candidate, id. Sec. 211B.15 subd. 3, is vague and overbroad. MCCL further argues that the subdivision that restricts corporate expenditures concerning the appointment of public officials and forbids a corporation's contribution of the "free service of its ... members," id. Sec. 211B.15 subd. 2, violates the First Amendment. Finally, MCCL challenges as unconstitutional as applied to it the limited statutory exemption of nonprofit corporations from the balance of the section on corporate political contributions. Id. Sec. 211B.15 subd. 15. Our decision on the challenge to section 211B.15 subd. 15 makes it unnecessary for us to consider the other issues.
 
 
 30
 The "nonprofit corporate exemption" relieves a nonprofit corporation from the corporate prohibitions set forth under section 211B.15 (including the prohibitions set forth in subdivisions 2 and 3) if that corporation:
 
 
 31
 (1) cannot engage in business activities;
 
 
 32
 (2) has no shareholders or other persons affiliated so as to have a claim on its assets or earnings; and
 
 
 33
 (3) was not established by a business corporation or a labor union and has a policy not to accept significant contributions from those entities.
 
 
 34
 Id. Sec. 211B.15 subd. 15.
 
 
 35
 The state acknowledges that these three conditions are drawn from the Supreme Court's opinion in FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 263-64, 107 S.Ct. 616, 630-31, 93 L.Ed.2d 539 (1986) (hereinafter MCFL ). The Minnesota legislature looked at three features of MCFL that, in the Supreme Court's view, qualified MCFL for exemption, and translated them into requirements for exemption under Minnesota law. The state claims that, because MCCL's activities did not strictly conform to the statute (MCCL engages in incidental business activities and has no policy of refusing significant contributions from corporations), MCCL is not exempt from the prohibitions of section 211B.15. We disagree, and hold that section 211B.15 subd. 15 is unconstitutional as applied to MCCL.
 
 
 36
 The general corporate restrictions on political speech as they appear in section 211B.15 could be declared unconstitutional if they were applied to nonprofit corporations organized solely for political purposes, as the "practical effect may be to discourage protected speech." MCFL, 479 U.S. at 255, 107 S.Ct. at 626 (plurality opinion). The state interest in preventing corruption, or the appearance of corruption, in the political process has been recognized as a compelling state interest that justifies restrictions on political contributions by business corporations. See Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 659, 110 S.Ct. 1391, 1397, 108 L.Ed.2d 652 (1990). But those same corporate campaign finance restrictions, if applied broadly to all nonprofit corporations, are not narrowly tailored to serve that purpose. See id. at 660, 110 S.Ct. at 1397. The state does not contend otherwise, and to avoid potential constitutional problems the Minnesota legislature enacted section 211B.15 subd. 15, the exemption for certain nonprofit corporations.
 
 
 37
 As noted above, the conditions that nonprofit corporations must meet to qualify for the exemption were taken from the Minnesota legislature's reading of the Supreme Court's opinion in MCFL. But the analysis in MCFL, upon which section 211B.15 subd. 15 was based, is not a constitutional test for when a nonprofit corporation must be exempt. Instead it is an application, in three parts, of First Amendment jurisprudence to the facts in MCFL. The state goes too far in concluding that the factual findings of MCFL translate into absolutes in legal application.
 
 
 38
 Two of the subsections under section 211B.15 subd. 15 pose problems for MCCL's qualification as an exempt nonprofit corporation as the state applies the statute to MCCL. First, MCCL engages in some minor business activities that generate minimal income but are incidental to its political purpose: it rents its mailing list and sells advertisements in its newsletter. The statute says MCCL "cannot engage in business activities" and still qualify as an exempt nonprofit. Minn.Stat. Sec. 211B.15 subd. 15(1). The Supreme Court in MCFL, in noting MCFL's avoidance of business activity as a reason to exempt it from Massachusetts's campaign regulations for corporations, set forth a rationale for its conclusion that is more relevant here than the particular fact that MCFL did not engage in business activities. The Court concluded that the lack of business activity "ensures that political resources reflect political support." MCFL, 479 U.S. at 264, 107 S.Ct. at 631. MCCL describes its own business activities as incidental to its political purposes, and the income derived from them as minimal, and the state does not dispute those contentions. Moreover, the business activities in which MCCL engages, we believe, would not draw income from those who were not supportive of MCCL's political agenda and thus such income would manifest political support. It is reasonable to assume that only those who are like-minded would pay for the use of MCCL's mailing list.[7] As for the newsletter, again presumably only those sympathetic to MCCL's views would pay to place an advertisement that would be read by MCCL supporters. Cf. supra note 6. So looking to the purpose of this condition for exemption and the facts here, rather than merely the factual application in MCFL, we hold that section 211B.15 subd. 15(1) as applied to MCCL to render it non-exempt, on the facts before us at this time, results in an unconstitutional infringement on MCCL's First Amendment rights.
 
 
 39
 MCCL also runs afoul of Minnesota's conditions for nonprofit exemption because it does not have "a policy not to accept significant contributions" from business corporations or labor unions. Minn.Stat. Sec. 211B.15 subd. 15(3). In fact, it has accepted corporate contributions. The state does not dispute MCCL's claim that the contributions are not "significant," but faults MCCL because it does not have a "policy" not to accept significant contributions. Again we consider the purpose underlying the Supreme Court's conclusion that this particular fact of MCFL's operations should relieve it of the campaign finance burdens that Massachusetts put upon for-profit corporations, rather than relying only upon the factual finding itself.
 
 
 40
 The Supreme Court concluded that MCFL's refusal to accept significant corporate contributions "prevents such corporations [as MCFL] from serving as conduits for the type of direct spending that creates a threat to the political marketplace." MCFL, 479 U.S. at 264, 107 S.Ct. at 631. This statement from the Court convinces us that the key issue here is the amount of for-profit corporate funding a nonprofit receives, rather than the establishment of a policy not to accept significant amounts. Unlike the situation in Austin, where the nonprofit organization was a chamber of commerce three-fourths of whose members were business entities, the facts before us in this case present no risk of "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." Austin, 494 U.S. at 660, 110 S.Ct. at 1397. The state, far from having shown that MCCL is amassing great wealth as a result of corporate donations, implicitly concedes that MCCL has not received any significant contributions from for-profit corporations.
 
 
 41
 "Some corporations have features more akin to voluntary political associations than business firms, and therefore should not have to bear burdens on independent spending solely because of their incorporated status." MCFL, 479 U.S. at 263, 107 S.Ct. at 631. MCCL, despite its failure to fit precisely into the facts of MCFL, is clearly that sort of corporation. We hold that section 211B.15 subd. 15 is unconstitutional as applied to MCCL, and that the facts before us today should qualify MCCL for exempt nonprofit status. Should these facts change, however, particularly as to the amount of revenue MCCL receives from its business activities, the business activities that produce the revenue, or the amount of contributions it receives from for-profit corporations or labor unions, the state may wish to revisit MCCL's qualification for the exemption.
 
 
 42
 We remand to the District Court with instructions to enter judgment for MCCL on its claim concerning the application of section 211B.15 subd. 15.
 
 III.
 
 43
 For its cross-appeal, the state claims the District Court erred in granting summary judgment for Schwietz and Angell, finding Minn.Stat. Sec. 10A.27 subd. 12 (Supp.1993) unconstitutional and enjoining its enforcement. Under that section of the campaign reform law, a political committee or political fund cannot "accept aggregate contributions from an individual, political committee, or political fund in an amount more that $100 a year." Id. We hold that the $100 limit is so low as to infringe upon the citizens' First Amendment right to political association and free political expression.
 
 
 44
 As emphasized by the Supreme Court's decision in Buckley v. Valeo, it is clear that state-enforced limits on campaign contributions and expenditures stifle First Amendment freedoms. Buckley, 424 U.S. at 19, 22, 96 S.Ct. at 634, 636. Here, because the limit applies to contributions both by and to political committees and funds, the limit affects not only free political speech but also free association, the "tradition of volunteer committees for collective action.... [B]y collective effort individuals can make their views known, when, individually, their voices would be faint or lost." Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, Cal., 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981); accord Buckley, 424 U.S. at 22, 25-26, 96 S.Ct. at 636, 637-38.
 
 
 45
 It also is well established that Minnesota's declared purpose in enacting its $100 limit--to avoid corruption or the appearance of corruption in the political process that could result from large amounts of special interest money circulating in the system--is a compelling state interest. Buckley, 424 U.S. at 26-27, 96 S.Ct. at 638; see also FEC v. National Conservative Political Action Comm., 470 U.S. 480, 496-97, 105 S.Ct. 1459, 1468, 84 L.Ed.2d 455 (1985) ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.").
 
 
 46
 But the fighting issue here is whether a $100 limit on contributions to political committees or funds is narrowly tailored to serve the state's interest, given the burden it imposes on political speech. Buckley, 424 U.S. at 25, 96 S.Ct. at 637. We hold that it is not.[8] "Given the important role of contributions in financing political campaigns, contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." Id. at 21, 96 S.Ct. at 636. And the concern of a political quid pro quo for large contributions, which becomes a possibility when the contribution is to an individual candidate, id. at 26, 27, 96 S.Ct. at 638 ("To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined."), is not present when the contribution is given to a political committee or fund that by itself does not have legislative power.
 
 
 47
 The Buckley Court, eighteen years ago, found that a $1000 limit--ten times the limit at issue here--was sufficiently high to pass constitutional muster as narrowly tailored to serve the state's concern for the integrity of the political system. We realize that the Buckley limit was never declared to be a constitutional minimum, but it does provide us with some guidance and a frame of reference in evaluating the constitutionality of Minnesota's $100 limit.
 
 
 48
 Among the undisputed facts relied upon by the District Court is the fact that a $100 contribution in 1976 would have a value of $40.60 in 1994 dollars, or approximately four percent of the $1000 limit approved in Buckley. The undisputed facts also show that one-fourth to one-third of MCCL-CSPC's contributions exceeded $100 in the most recent election cycle (presumably the cycle before the one now underway). Based on these facts, we agree with the District Court that a $100 limit on contributions to or by political committees and funds significantly impairs the ability of individuals and political committees and funds to exercise their First Amendment rights. An annual $100 limit on contributions to or by political funds and committees is too low to allow meaningful participation in protected political speech and association, and thus is not narrowly tailored to serve the state's legitimate interest in protecting the integrity of the political system. Accordingly, we hold that the $100 limit violates the protections afforded by the First Amendment for free political speech and free association.
 
 
 49
 The judgment of the District Court invalidating section 10A.27 subd. 12 and permanently enjoining its enforcement is affirmed.
 
 IV.
 
 50
 To summarize, we reverse the judgment of the District Court on the facial challenges to section 10A.25 subd. 13 and section 10A.20 subd. 6b of the Minnesota Statutes. Further, we reverse the District Court's judgment on MCCL's as-applied challenge to section 211B.15 subd. 15. We affirm the judgment of the District Court finding section 10A.27 subd. 12 unconstitutional and permanently enjoining its enforcement.
 
 
 51
 The case is remanded to the District Court for the entry of judgment and the appropriate injunctions in accordance with this opinion.
 
 
 
 *
 The Honorable Joseph E. Stevens, Jr., Chief Judge, United States District Court for the Western District of Missouri, sitting by designation
 
 
 [1]
 Holahan was substituted for Vanne Owens Hayes, who was the chairman of the Minnesota Ethical Practices Board when plaintiffs filed suit
 
 
 [2]
 There seems to be a genuine question here whether the Minnesota Ethical Practices Board can implement this statute and still comply with the terms of other Minnesota campaign finance laws. Section 10A.25 subd. 13 requires that the additional subsidy be paid six days (by the time all the statutory notices are given) after the independent expenditure is made (or obligated to be made). It does not exclude independent expenditures made against primary candidates from the calculation of the additional subsidy, yet such candidates cannot be paid an additional public subsidy because they are ineligible for any public subsidy until they win the primary. See Minn.Stat. Sec. 10A.31 subd. 6 (Supp.1993). The state acknowledges this outcome. Brief for Appellee/Cross-Appellant at 7 ("Therefore, Minn.Stat. Sec. 10A.25, subd. 13 (Supp.1993), has no application to independent expenditures made in connection with a primary election."). By the same token, winning primary candidates will not be eligible for a public subsidy unless and until they win five percent or ten percent (depending upon the office sought) of the total vote in the general election. Minn.Stat. Sec. 10A.31 subd. 7 (Supp.1993). Since election results must be certified before this determination can be made, there seem to be no circumstances in which the Board will be able to pay the additional subsidy within the six days required by law
 
 
 [3]
 To the extent the statute encroaches upon the ability of "like-minded persons to pool their resources in furtherance of common political goals," it also implicates "protected associational freedoms." Buckley v. Valeo, 424 U.S. 1, 22, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976) (per curiam)
 
 
 [4]
 The appellants offered evidence that Senator John Marty, then chairman of the Senate Ethics and Campaign Reform Committee and chief author of the senate bill, explained to the Senate Committee on Finance how the legislation would prevent or dramatically limit independent expenditures, a goal that he recognized could not be accomplished directly because it would violate the First Amendment. See Affidavit of Frank J. Walz at 10-12 (Feb. 23, 1994)
 
 
 [5]
 Because the statistics for the three years were for different groups of candidates, it is not possible to compare the figures directly. Nevertheless, there is no argument from the state contesting the proposition that participation in the public campaign financing scheme is very high, nearing 100%
 
 
 [6]
 To the extent that the state's brief can be read as arguing that the level of candidate participation in publicly financed campaigns may be eroded in the absence of these limitations on the speech and association rights of those who wish to make independent expenditures, the argument lacks factual support and must be regarded as wholly speculative
 
 
 [7]
 The exception here would be some aberrant plan to use the mailing list to harass MCCL's supporters. We assume that MCCL screens requests for its mailing list to filter such uses. In any event the list-renter would know that the fee he pays is going to support MCCL's activities
 
 
 [8]
 The District Court did not reach the equal protection argument raised in that court. It appears that the legislators who enacted the $100 limit on contributions to political committees and funds, and the governor who signed the limit into law, approved limits on election-year contributions to themselves that were many times higher than the $100 limit on contributions to committees and funds. See Minn.Stat. Sec. 10A.27 subd. 1 (Supp.1993). Because we hold the statute unconstitutional under the First Amendment, we do not address the Fourteenth Amendment issue