# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-2351

_____

|  |  |  |
|---|---|---|
| Shrink Missouri Government PAC, a political action committee; Zev David Fredman, | * * * * | |
|  | * | |
| Appellants, | * | |
|  | * | |
| v. | * | |
|  | * | |
| Richard Adams, in his official capacity as a Member of the Missouri Ethics Commission; Patricia Flood, in her official capacity as a Member of the Missouri Ethics Commission; Robert Gardner, in his official capacity as a Member of the Missouri Ethics Commission; Ervin Harder, in his official capacity as a Member of the Missouri Ethics Commission; John Howald, in his official capacity as Chairman of the Missouri Ethics Commission; Elaine Spielbusch, in her official capacity as a Member of the Missouri Ethics Commission; Jeremiah W. Nixon, in his official capacity as Missouri Attorney General; Robert P. McCullough, in his official capacity as St. Louis County Prosecuting Attorney, | * * * * * * * * * * * * * * * * * * * | Appeal from the United States District Court for the Eastern District of Missouri |
|  | * | |
| Appellees, | * | |
|  | * | |

Joan Bray,                                  *
                                            *
        Intervenor on Appeal,              *
                                            *
--------------------                        *
                                            *
Common Cause,                               *
                                            *
        Amicus Curiae.                      *

_____

Submitted:  August 21, 1998
Filed:  November 30, 1998

_____

Before BOWMAN, Chief Judge, ROSS and JOHN R. GIBSON, Circuit Judges.

_____

BOWMAN, Chief Judge.

Shrink Missouri Government PAC and Zev David Fredman (collectively, SMG) appeal from the decision of the District Court granting summary judgment to members of the Missouri Ethics Commission, Missouri Attorney General Jay Nixon, and St. Louis County Prosecuting Attorney Robert P. McCullough[1] (collectively, the State) on SMG's challenge to certain provisions of Missouri's campaign finance law. We reverse and remand.

_____

[1]Although counsel for the prosecuting attorney spells the name of his client differently, we use the spelling as it appeared in the original complaint and as it still appears in the caption of this case.

I.

In July 1994, the Missouri legislature, by enacting Senate Bill 650 (SB650), adopted certain amendments to the state campaign finance law that, among other things, restrict the amount of campaign contributions that persons can make to candidates for public office. The limits were to become effective on January 1, 1995. In November 1994, the electorate approved Proposition A, a ballot initiative that imposed even more restrictive contribution limits than those contained in SB650. Proposition A became effective immediately upon voter approval. In December 1995, this Court held that the Proposition A limits on campaign contributions violated the First Amendment. See Carver v. Nixon, 72 F.3d 633 (8th Cir. 1995), cert. denied, 518 U.S. 1033 (1996).[2] At that time, the limits of SB650 became effective.

Under the provisions of SB650 challenged here, "the amount of contributions made by or accepted from any person other than the candidate in any one election shall not exceed" $1,075 to candidates for governor, lieutenant governor, secretary of state, state treasurer, state auditor, or attorney general, or for any office where the population of the electoral district is 250,000 or more; $525 to candidates for state senator, or for any office where the population of the electoral district is 100,000 or more; and $275 to candidates for state representative, or for any office where the population of the electoral district is less than 100,000. Mo. Rev. Stat. § 130.032.1 (Supp. 1997) (as amended early in 1998 by the Missouri Ethics Commission to account for inflation, see Mo. Rev. Stat. § 130.032.2 (Supp. 1997)).

---

[2]We did say in Carver that "we generally accept the limits established by the legislature." 72 F.3d at 641. But even if that comment could be construed to mean that the Court believed the SB650 limits to be constitutional (an excessively broad reading, we think), it is obiter dictum and is not binding on the Court in this case.

SMG, a political action committee organized and doing business in Missouri, and Fredman, a resident of and registered voter in Missouri and an unsuccessful candidate for the Republican party's nomination for state auditor this election cycle, filed suit claiming that the limits violate their First Amendment rights of free speech and association. The parties filed cross motions for summary judgment; the District Court denied SMG's motions for summary judgment and for injunctive relief, and granted the State's summary judgment motion. SMG filed a notice of appeal, and on July 27, 1998, we granted SMG's motion for an injunction against enforcement of the campaign contribution limits of SB650 pending appeal.

II.

We first address a question initially presented in the last few pages of the State's brief. The State claims that SMG and Fredman lack standing to challenge these contribution limits. We take up the question as our first matter of business, because we lack jurisdiction to entertain the appeal if both SMG and Fredman are without standing.

The State asserts that the injuries alleged are "contrived," "conjectural," and "hypothetical." Brief of Appellees at 49, 50. We disagree. The State cannot make a persuasive argument that SMG and Fredman are not and have not been harmed by the limits imposed on campaign contributions by SB650. See Shrink Mo. Gov't PAC v. Adams, No. 98-2351, Order at 3-4 (8th Cir. July 27, 1998) (order granting motion for injunction pending appeal). The only question, as we see it, is whether Fredman continues to have standing despite his loss as a candidate for statewide office in the August primary election. We hold that he does, as the State declined at oral argument to assure the Court that no recourse would be taken against those who, like Fredman, accepted campaign contributions in excess of the SB650 limits after July 27, 1998 (the date we ordered an injunction pending appeal), should the summary judgment be affirmed.

We hold that SMG and Fredman have standing to continue their challenge to the provisions of SB650 here at issue.

## III.

We proceed now to the merits, reviewing the decision to grant summary judgment de novo. The question before us is straightforward: do the SB650 limits on political campaign contributions violate SMG's and Fredman's First Amendment rights of free speech and association?

The State insists, as it did in Carver, that campaign contribution limits are subject only to intermediate scrutiny, not the "rigorous standard of review" employed by the Court in Buckley v. Valeo, 424 U.S. 1, 29 (1976) (per curiam). But as we noted in Carver, the Supreme Court "articulated and applied a strict scrutiny standard of review" to the federal contribution limits that were under challenge in Buckley, and "has not ruled that anything other than strict scrutiny applies in cases involving contribution limits." Carver, 72 F.3d at 637; see also Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, Cal., 454 U.S. 290, 294 (1981) ("[R]egulation of First Amendment rights is always subject to exacting judicial review."); Russell v. Burris, 146 F.3d 563, 567 (8th Cir.), cert. denied, 67 U.S.L.W. 3332 (U.S. Nov. 16, 1998) (Nos. 98-397, 98-399). The State must demonstrate, therefore, that it has a compelling interest and that the contribution limits at issue are narrowly drawn to serve that interest. See Buckley, 424 U.S. at 25; Russell, 146 F.3d at 567; Carver, 72 F.3d at 638.

## A.

The State contends that its compelling interest is in avoiding the corruption or the perception of corruption brought about when candidates for elective office accept large campaign contributions. The State further posits, citing Buckley, that corruption

and the perception thereof are inherent in political campaigns where large contributions are made, and that it is unnecessary for the State to demonstrate that these are actual problems in Missouri's electoral system. Recent precedent from this Court is to the contrary. In both Carver and Russell, we were not satisfied with the mere contention that the states have an interest (an indisputably compelling interest, see Day v. Holahan, 34 F.3d 1356, 1365 (8th Cir. 1994), cert. denied, 513 U.S. 1127 (1995)) in maintaining the integrity of their elections. We required some demonstrable evidence that there were genuine problems that resulted from contributions in amounts greater than the limits in place. See Russell, 146 F.3d at 568 ("The defendants must *prove* first that there is real or perceived undue influence or corruption attributable to large political contributions . . . .") (emphasis added); id. at 569 (noting that none of the defendants "provided any credible evidence" of actual corruption, nor had they proved a perception of corruption); Carver, 72 F.3d at 638.[3]

In reaching its conclusions concerning the constitutionality of federal campaign contribution restrictions, the Buckley Court noted the perfidy that had been uncovered in federal campaign financing in 1972. See 424 U.S. at 27 n.28. But we are unwilling to extrapolate from those examples that in Missouri at this time there is corruption or a perception of corruption from "large" campaign contributions, without some evidence that such problems really exist. See Russell, 146 F.3d at 569; Carver, 72 F.3d at 638. We will not infer that state candidates for public office are corrupt or that they appear corrupt from the problems that resulted from undeniably large contributions made to

---

[3]On the subject of the State's burden to prove its compelling interest, this Court in Carver quoted (with some alterations by the Carver Court) the following passage from United States v. National Treasury Employees Union, 513 U.S. 454, 475 (1995), which in turn quoted Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 664 (1994) (plurality opinion of Kennedy, J.): "'When the Government defends a regulation on speech . . . it must do more than simply "posit the existence of the disease sought to be cured." . . . It must demonstrate that the recited harms are real, . . . and that the regulation will in fact alleviate these harms in a direct and material way.'"

federal campaigns over twenty-five years ago. The State therefore must prove that Missouri has a real problem with corruption or a perception thereof as a direct result of large campaign contributions.

For its evidence, the State relies on the affidavit of the state senator who co-chaired the Interim Joint Committee on Campaign Finance Reform when the contribution limits were enacted. That senator pointed to no evidence that "large" campaign contributions were being made in the days before limits were in place, much less that they resulted in real corruption or the perception thereof. See Buckley, 424 U.S. at 28 (noting that "the problem of *large* campaign contributions [is] the narrow aspect of political association where the actuality and potential for corruption have been identified") (emphasis added). The senator did not state that corruption then existed in the system, only that he and his colleagues believed there was the "real potential to buy votes" if the limits were not enacted, and that contributions greater than the limits "have the appearance of buying votes." Affidavit of Senator Wayne Goode at ¶ 9. His statement that "[t]he greater the contribution, the greater potential there is for the appearance of and the actual buying of votes," id., is conclusory and self-serving, given the senator's vested interest in having the courts sustain the law that emerged from his committee. There is no way for us to tell whether this single legislator's perception of corruption is the "public perception," whether it is objectively "reasonable," and whether it "derived from the magnitude of . . . contributions" that historically have been made to candidates running for public office in Missouri. Russell, 146 F.3d at 569.

As a matter of law, the State has failed to come forward with evidence to prove a compelling interest that would be served by the restrictions SB650 imposes on campaign contributions. In fact, the State has been unable to adduce sufficient evidence even to show that there exists a genuine issue of material fact regarding its alleged interest. Therefore, the limits here cannot withstand constitutional challenge.

B.

Even if the State had come forward with evidence sufficient to show that it had a compelling interest in enacting and enforcing campaign contribution limits, it cannot demonstrate that the SB650 limits on the amount of campaign contributions are narrowly tailored to serve that interest. That is, we can say as a matter of law that the limits at issue here are so small that they run afoul of the Constitution by unnecessarily restricting protected First Amendment freedoms.

After inflation, limits of $1,075, $525, and $275 cannot compare with the $1,000 limit approved in <u>Buckley</u> twenty-two years ago.[4] We previously have acknowledged that the Court in <u>Buckley</u> did not declare that limits of less than $1,000 on contributions are unconstitutional per se, but we also recognize that the $1,000 figure provides us with something of a benchmark. <u>See</u> <u>Day</u>, 34 F.3d at 1366. In today's dollars, the SB650 limits appear likely to "have a severe impact on political dialogue" by preventing many candidates for public office "from amassing the resources necessary for effective advocacy." <u>Buckley</u>, 424 U.S. at 21. Even if the State had demonstrated a compelling interest, the limits set by SB650, absent the State's having proven the actual necessity for such a heavy-handed restriction of protected speech, can only be regarded as "too low to allow meaningful participation in protected political speech and association, and thus . . . not narrowly tailored to serve" the alleged interest. <u>Day</u>, 34 F.3d at 1366.

---

[4]SMG contends that $1,075 in 1976 dollars is the equivalent of just $378 in purchasing power today. The State argues that SMG's use of the Consumer Price Index (CPI) to calculate the effects of inflation on dollars spent for campaign contributions is inappropriate. Nevertheless, the State has not come forward with any other measure it deems more appropriate. In fact, the subsection of SB650 that provides for the biennial adjustment of the contribution limits to account for inflation relies on the CPI for the calculation. <u>See</u> Mo. Rev. Stat. § 130.032.2 (Supp. 1997).

In the circumstances presented here, we do not believe that we run the risk of attempting to "fine tun[e]" the work of the Missouri legislature, or that we otherwise are exercising authority that is not ours in order to hold that these limits are overly restrictive of freedoms protected by the First Amendment. Buckley, 424 U.S. at 30. We so conclude because the difference between these limits of $1,075, $525, and $275, and larger dollar limits that might be constitutionally sound (that is, narrowly tailored to serve a compelling state interest), are not "distinctions in degree" but "differences in kind." Id. But see Kentucky Right to Life, Inc. v. Terry, 108 F.3d 637, 648 (6th Cir.) (holding that "$1,000 limitation on direct contributions in connection with local and state elections in Kentucky is not different in kind from the $1,000 limitation on direct contributions in connection with federal elections upheld in Buckley"), cert. denied, 118 S. Ct. 162 (1997). Although, like the Court in Buckley, we are not prepared to state definitively what difference would be one of "degree" as compared with one of "kind," we can say these limits are overly restrictive as a matter of law. We again remind the State that it has the burden of showing that any limits it places on campaign contributions are narrowly tailored to serve the State's compelling interest in addressing proven "real or perceived undue influence or corruption attributable to large political contributions." Russell, 146 F.3d at 568. Once those who would regulate and limit constitutionally protected political speech satisfy their heavy burden of proof, the problem of judicial line-drawing can be expected largely to disappear.

## IV.

In sum, the campaign contribution limits at issue in this case, even with the biennial adjustments for inflation that SB650 provides, violate SMG's and Fredman's First Amendment rights of free speech and association. The judgment of the District Court is reversed and the case is remanded with instructions to enter summary judgment for SMG and Fredman.

-9-

ROSS, Circuit Judge, concurring.

I concur in the decision to reverse the judgment of the district court and remand for entry of summary judgment for SMG and Fredman. I do so because I agree with part III A of the majority opinion holding that the State failed to satisfy its evidentiary burden.

However, for the reasons stated by Judge Gibson, I do not join in part III B of Judge Bowman's opinion finding that the contribution limits are different in kind from those approved in Buckley v. Valeo, 424 U.S. 1 (1976).

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent.

The Court today departs from the teaching of Buckley v. Valeo, 424 U.S. 1 (1976), and gives far too expansive a reading to the recent decisions of this Court in Carver v. Nixon, 72 F.3d 633 (8th Cir. 1995), and Russell v. Burris, 146 F.3d 563 (8th Cir. 1998). Upon a record more slender than the one before us, Buckley upheld contribution limits of $1,000 per election for all federal offices, while Missouri's statute provides a $1,075 limit for statewide offices. Mo. Rev. Stat. § 130.032 (Supp. 1997). Because I cannot distinguish Buckley from the present case, I would uphold the contribution limits at issue.

## I.

In Carver and Russell, we faced graduated annual contribution limits between $300 for statewide offices and $100 for other offices, and we held that both statutes violated the First Amendment. Carver, 72 F.3d at 641-44; Russell, 146 F.3d at 569-71.

Both statutes were adopted by initiative petitions.[5]  We contrasted these limitations with those at issue in <u>Buckley</u> -- $1,000 per election or $2,000 per election cycle -- and found them "different in kind."  <u>Carver</u>, 72 F.3d at 644; <u>Russell</u>, 146 F.3d at 571.  For example, we observed that the limitations challenged in <u>Carver</u> were the lowest contribution limits in the nation and that the State had presented only meager evidence to justify these limitations.  72 F.3d at 641-42.  The holdings of <u>Carver</u> and <u>Russell</u>, that statewide limits of $300 per election cycle "differ in kind" from the limit in <u>Buckley</u> of $2,000, point compellingly to a different conclusion in this case.

It is of interest that <u>Carver</u> contrasted Proposition A -- with limits ranging from $100 to $300 -- to the legislation now before us, with limits then ranging from $250 to $1,000.  <u>Id.</u> at 642-43.  In view of the Attorney General's opinion, the dollar limits in Proposition A were the more restrictive and therefore provided the relevant limitation on the plaintiffs' contributions.  <u>Id.</u> at 634-35.  <u>Carver</u> struck Proposition A's limits but did not discuss the propriety of the limits now before us.  Nevertheless, in contrasting Proposition A's limits with those enacted by the legislature, the similarity between the legislatively-enacted limits and those in <u>Buckley</u> was evident.

Less evident is how to distinguish <u>Buckley</u> from the present case.  When we compare the $1,075 contribution limit[2] imposed by Senate Bill 650 for each election

---

[1]The Arkansas statutes in <u>Russell</u> had a $100 limit for all state offices other than the enumerated offices which were elected statewide.  <u>Russell</u>, 146 F.3d at 565.  The provisions at issue in <u>Carver</u> contained limitations of $100 per election cycle for candidates in districts with fewer than 100,000 residents; $200 for candidates in districts of 100,000 or more residents; and $300 for statewide candidates.  <u>Carver</u>, 72 F.3d at 635.

[2]The legislation at issue imposes a limit of $1,075 per election, but a $2,150 limit per "election cycle."  An "election cycle" is the "period of time from [the] general election for an office until the next general election for the same office."  Mo. Rev. Stat. § 130.011 (Supp. 1995).  It is of interest that the average household income in Missouri is about $31,000 per year.

with the $1,000 upheld by <u>Buckley</u>, there is simply no difference in kind.  The $1,075 limit applies to statewide races, just as <u>Buckley</u>'s $1,000 limit applies to the Senate, a statewide race, and the presidential elections.  <u>Buckley</u>'s reasoning would similarly uphold Senate Bill 650's lower contribution limits in non-statewide elections.  When one accounts for the lower number of voters in non-statewide electoral districts, the limits at issue compare favorably with the $1,000 limit in <u>Buckley</u>, which applied to statewide races as well as to elections for the U.S. House of Representatives.  There are nine House districts in Missouri, and in the most recent statewide election, the number of votes cast in these districts averaged 235,094.  <u>Official Manual, State of Missouri</u> 563-65 (1997).  Meanwhile, Senate Bill 650 imposes a contribution limit of $525 upon races for state senators as well as to certain other elections in districts ranging from 100,000 to less than 250,000 in population.  Mo. Rev. Stat. § 130.032 (Supp. 1997).  There are thirty-five Senate districts in Missouri.  Seventeen of these seats were contested in 1996, and an average of 59,254 people voted in each election. <u>Official Manual, State of Missouri</u> 566-67 (1997).  When the size of the state senatorial districts is contrasted with federal congressional districts as well as the entire State itself, there is plainly no "difference in kind" between these legislative limits and those countenanced by <u>Buckley</u>.  Finally, the same must be said for the $275 limit for state House elections.  In the last election, the number of votes cast in such districts averaged 12,325.  <u>Id.</u> at 567-80. With the  number of voters in such districts, I cannot conclude that the $275 limit "differs in kind" from those that <u>Buckley</u> upheld.  As <u>Buckley</u> observed, Congress could have structured limits in a graduated fashion, but its failure to do so did not invalidate the legislation.  <u>Buckley</u>, 424 U.S. at 30; <u>Carver</u>, 72 F.3d at 641.  <u>Buckley</u> recognizes, then, that graduated limits such as Missouri's are an acceptable solution to the dangers posed by unlimited campaign contributions.

<u>Carver</u>, <u>Russell</u>, and Part III B of Chief Judge Bowman's opinion in this case discuss at length the effect of inflation upon the <u>Buckley</u> limits.  <u>Carver</u>, 72 F.3d at 641;

Russell, 146 F.3d at 570-71. Yet Missouri's statute expressly addresses the inflation problem, and the $1,000 limit initially enacted has now grown to $1,075. See Mo. Rev. Stat. § 130.032.2 (Supp. 1997) (limits adjusted for inflation). Significantly, the campaign expenditures in Missouri's statewide elections have risen markedly since Senate Bill 650's enactment, and there is no basis for rejecting the district court's conclusion that candidates for office remain "able to amass impressive campaign war chests."[3]

Buckley, of course, did not establish $1,000 as the constitutional floor for permissible contribution limitations; see Day v. Holahan, 34 F.3d 1356, 1366 (8th Cir. 1994). But even if it had, I would reject the argument in Part III B that inflation has dissipated the similarity between the limits in this case and those approved in Buckley. Inflation has not undermined Buckley's precedential weight or modified its holding. The $1,000 limit upheld in Buckley remains and is the law today, even though we have used inflation to compare present contribution limitations with those upheld in 1976. See Carver, 72 F.3d at 641; Russell, 146 F.3d at 570-71; Day, 34 F.3d at 1366.[4] Despite ample opportunity to modify Buckley, the Supreme Court has never added the "inflation proviso" that Part III B relies upon. If Buckley's holding must wax and wane with inflation, as Part III B seems to argue, then the very statute that Buckley upheld would now be unconstitutional, for inflation alone would render the $1,000 limit "different in kind" from when the Supreme Court upheld it. Whatever may be the

---

[3]See District Court Memorandum and Order at 15-16, J. App. 191-92; see also J. App. 43-52.

[4]In all three cases, the limits at issue were patently "different in kind" from the limits in Buckley, with or without the aid of inflation. Carver and Russell struck election cycle limits ranging from $300 for statewide offices to $100 for other offices, while Day struck a $100 limit. Carver, 72 F.3d at 641-44; Russell, 146 F.3d at 569-71; Day, 34 F.3d at 1366.

pernicious effects of inflation, I am certain that the First Amendment's dictates do not depend upon the Consumer Price Index.

More importantly, even if it were proper to adjust Buckley for inflation, Part III B lacks a principled yardstick to assess the constitutionality of any contribution limit. Its measure of what "differs in kind" and what "differs in degree" from the Buckley limits is standardless and lacks any explanation to support its bald conclusion that the limits at issue are "overly restrictive as a matter of law."[5]

## II.

Putting to one side the facial similarity between the statute stricken today and that upheld in Buckley, the State has adequately justified the contribution limits at issue. Buckley and our cases both teach that contribution limits are subject to "the closest scrutiny." Buckley, 424 U.S. at 25; Carver, 72 F.3d at 636; Russell, 146 F.3d at 567. The State has the burden to demonstrate a compelling interest, which Buckley defined as limiting the reality or appearance of political corruption stemming from large financial contributions. 424 U.S. at 26. Both Carver and Russell found no direct evidence of real or perceived undue influence. Carver, 72 F.3d at 642-43; Russell, 146 F.3d at 569-70. Accordingly, we struck the contribution limits in both cases.

The present case is readily distinguishable from Carver and Russell. Although the House and Senate in Missouri preserve no formal legislative history, the record hardly lacks evidence that the statute at issue limits the reality or perception of undue

---

[5]Indeed, even with the aid of inflation, it does not follow that today's contribution limits "differ in kind" from what the Supreme Court upheld in 1976. Differing costs, whether higher or lower, of new communications media (fax machines, e-mail, and the Internet, as well as more traditional modes of political speech) and modern fund-raising methods (the emergence of "soft money" is but one relevant post-Buckley development) simply make comparison a morass of conjecture.

influence and corruption. In summary judgment papers, the State presented an affidavit of Senator Wayne Goode. Goode served twenty-two years in the Missouri House and nine years in the Senate before he co-chaired the Joint Interim Committee on Campaign Finance Reform that prepared Senate Bill 650, now the statute before us. The senator stated that the Committee heard "a broad spectrum of opinions ... on the issue of campaign contribution limits." He described the committee discussions of what it costs to run a campaign and the level at which contributions threaten to corrupt political officials and to erode public confidence in the electoral process. The committee heard testimony on the issue of balancing the need to run an effective campaign against the need to limit the potential for buying influence. Balancing the concerns, the committee reached the contribution limits of $250 to $1,000 by consensus.[6] Goode and the other members believed that contributions over those limits create both the appearance that contributors could purchase the votes of elected officials and the danger of actual vote-buying. The most recent elections themselves suggest that the State has limited at least the appearance of corruption in the political process. Goode Affidavit, ¶ 11; J. App. 171. The limits prevent disproportionate funding of particular campaigns and curtail

---

[6]The Court today attempts to minimize Senator Goode's affidavit as the testimony of a single legislator, but the affidavit contains the Senator's description of the legislature's conclusions, which is precisely the support cited by <u>Buckley</u> when it upheld the contribution limits imposed by Congress. <u>See</u> 424 U.S. at 27, 28, 30. It must again be emphasized that Goode's observations are those of the co-chair of the joint legislative committee from which the limits at issue originated. To brand his affidavit as "self-serving, given the senator's vested interest in having the courts sustain the law that emerged from his committee" not only rules upon the credibility of a witness on a summary judgment motion, but also gratuitously impugns the senator's description of the evidence before the Committee, the conclusions drawn by the Committee, and his fellow legislators' first-hand knowledge of what it costs to wage a campaign and the dangers presented by contributions above the limits enacted.

the opportunities for buying political influence. Id. This evidence stands in stark contrast to the lack of evidence on these issues in Carver and Russell.[7]

In addition to the description in Senator Goode's affidavit, what record is available to us reflects that the House and Senate in Missouri exerted considerable effort in reaching accord on the bill finally enacted. Two bills containing contribution limits were introduced in the House, House Bills 1304 and 1523. Senate Bill 801 was introduced and passed in the Senate, and the House passed the House Committee's substitute for Senate Bill 650. A conference committee substitute for the House Committee substitute for Senate Bill 650 was ultimately adopted by the House and Senate and signed by the Governor. This action in both legislative bodies demonstrated the careful attention given to this legislation and the give-and-take before final enactment. We commented upon this process in Carver. 72 F.3d at 645 n.18.

Carver also recited the Supreme Court's admonition that we "must accord substantial deference to the predictive judgments of the legislature." 72 F.3d at 644 (quoting Turner Broadcasting System v. FCC, 512 U.S. 622, 665 (1994)). Turner referred to the deference owed to Congressional findings. In Carver, we left open the question whether state legislatures are due similar deference. Carver, 72 F.3d at 644. Although Carver rejected the State's argument that we should accord such deference to a citizens' initiative, the limitations now before us became law only after careful and informed deliberation by the legislature. The Court should not so lightly cast aside the legislature's findings in favor of its own. It is hardly counterintuitive that large campaign contributions might corrupt politics and invite public cynicism. The State has imposed only modest restrictions upon political speech, and it need not justify them with scientific precision.

---

[7]Carver and Russell involved only evidence of certain specific contributions, without evidence of their impact, as after-the-fact justifications for the initiative proposals at issue.

-16-

The Court's rejection of the description of Senate Bill 650's legislative underpinnings is plainly at odds with Buckley. Accepting the argument that the appearance of political corruption could justify the limitations then at issue, Buckley stated:

> Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions... Here, ... Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent."

424 U.S. at 27 (quoting C.S.C. v. Letter Carriers, 413 U.S. 548, 565 (1973)). It is true that the State must do more than simply "posit the existence of the disease to be cured." See Carver, 72 F.3d at 638 (citing United States v. National Treasury Employees Union, 513 U.S. 454, 475 (1995) (quoting Turner Broadcasting System v. FCC, 512 U.S. 622, 664 (1994) (Kennedy, J., plurality))). The State, by the Goode affidavit, has demonstrated not only the dangers posed by unlimited campaign contributions, but also the conclusions reached as to "alleviat[ing] these harms in a direct and material way." Id.

I cannot reconcile the short shrift given the Goode affidavit by the Court today with the Supreme Court's approach in Buckley, which cited no actual evidence that large contributions might give rise to the appearance of political corruption and which deferred to what Congress could have reasonably concluded.[8] See 424 U.S. at 27, 28,

---

[8]Although the need to limit the perception of political corruption by itself justifies the contribution limits at issue, today's opinion takes note of what little evidence of actual corruption was before the Buckley court: the "perfidy that had been uncovered in federal campaign financing in 1972." See Buckley, 424 U.S. at 27 n.28. Yet Buckley's passing reference to the 1972 election does not aid this Court's opinion. Buckley nowhere supports the particular scrutiny undertaken by the Court today.

30 (Congress "could legitimately conclude" that avoiding the appearance of corruption is essential to maintaining confidence in government; Congress "was surely entitled to conclude" that disclosure limitations alone would not adequately combat corruption and its appearance; Congress "was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.").

Senate Bill 650 is premised upon just such reasonable legislative conclusions, as evidenced by Senator Goode's affidavit. The Court today rejects those conclusions, which closely resemble those recognized by <u>Buckley</u> when it upheld limitations strikingly similar to those now at issue. In rejecting the state's evidence, the Court sidesteps binding Supreme Court precedent and fails to provide meaningful guidance to those who might hope to craft campaign reform legislation that will survive this Court's unprecedented scrutiny.

### III.

It must also be noted that the Sixth Circuit has recently approved a Kentucky law with a contribution limit of $1,000 per election year. <u>Kentucky Right to Life v. Terry</u>, 108 F.3d 637, 648 (6th Cir. 1997). The Court creates a conflict between the circuits, and in doing so disregards the inescapable similarity between the legislation that it strikes and that which the Supreme Court upheld.

---

Certainly, it provides no suggestion that the Goode affidavit would fail to satisfy whatever evidentiary inquiry is required to support a legislative body's conclusion that financial contributions have created or will create the appearance of corruption.

Perhaps members of the Court quarrel not only with the contribution limits at issue today, but with <u>Buckley</u> itself, as was made evident during oral argument. We are bound by <u>Buckley</u> unless and until the Supreme Court declares otherwise.

I would affirm the summary judgment of the district court upholding the contribution limits in Senate Bill 650.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.