Steven **KRICHBAUM**, Plaintiff,

v.

**U.S. FOREST SERVICE, and Steve Parsons, Defendants.**

**No. Civ.A. 97–0027–H.**

United States District Court, W.D. Virginia, Harrisonburg Division.

Jan. 22, 1998.

Steven Krichbaum, Staunton, VA, pro se.

Alonzo H. Long, Roanoke, VA, for U.S. Forest Service, Defendant.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

This matter comes before the court on plaintiff Steven Krichbaum's January 13, 1998 Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction. Mr. Krichbaum ("Krichbaum") moves the court to enjoin the defendants and any of their agents from harvesting any trees or undertaking any actions preparatory to logging (*e.g.*, road building, marking trees designated for cutting, etc.) in the Alba Salvage Timber Sale ("Alba Sale") project area of the George Washington National Forest ("Forest") in Augusta County, Virginia.

Krichbaum alleges that the defendants have approved the Alba Sale "... without adequately considering the sale's environmental impacts or effects, without performing necessary inventories and studies, without complying with the Forest Plan, and without complying with current laws and regulations governing the preparation and disclosure of environmental analysis." Plaintiff's Motion at 1.

After hearing oral argument on January 15, 1998 and after considering the record in this case, the court determines that the plaintiff is not entitled to the injunctive relief he seeks. Accordingly, for the reasons stated herein, the court will deny Mr. Krichbaum's motion.

### I.

Either a temporary restraining order or a preliminary injunction "... is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Federal Leasing, Inc. v.*

*Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981). A motion for a TRO or for a preliminary injunction is governed by the "balance of hardships" test set forth in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 195–96 (4th Cir. 1977); *see also Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994).

Under *Blackwelder,* the court must make a determination that the plaintiff(1) will suffer irreparable harm if he does not receive the requested injunctive relief. Once this finding has been made, the court must assess (2) the likelihood of harm to the defendants if the court issues a TRO or preliminary injunction against them. The court then must balance these harms to be suffered by the parties if the court denies or grants, respectively, the motion for injunctive relief. Thereafter, the court must conclude (3) that the plaintiff is likely to succeed on the merits, or if the balancing test in the previous steps (*i.e.,* steps "(1) and (2)") clearly favors the plaintiff, the court need only satisfy itself that the plaintiff has raised substantial and serious questions on the merits. Finally, the court should consider (4) whether public interest favors injunctive relief. *Blackwelder,* 550 F.2d at 195–96; *Multi–Channel TV Cable Co.,* 22 F.3d at 551 (quoting *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812–13 (4th Cir.1991)).

■ The four *Blackwelder* factors ". . . are not, however, all weighted equally." *Hughes Network Systems v. InterDigital Communications,* 17 F.3d 691, 693 (4th Cir.1994) (Wilkinson, J.). "The 'balance of hardships' reached by comparing the relevant harms to the plaintiff and defendant[s] is the most important determination, dictating, for example, how strong a likelihood of success show-

ing the plaintiff must make." *Id.* (citing *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991)).[1] Thus, while the four factors must figure into the court's analysis, the weight given to each depends on the strength of the other factors.

■ "Additionally, while the factors articulated in *Blackwelder* guide the district court's judgment on a [TRO or] preliminary injunction motion, the decision to grant or deny relief lies within that court's sound discretion and will not be set aside absent an abuse of discretion." *Id.* (citing *Rum Creek,* 926 F.2d at 358)).

## II.

Before undertaking full consideration of the *Blackwelder* "balance of hardships" test, the court turns to the factual and procedural background of the case.[2] Mr. Krichbaum seeks judicial review, under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq.,* of an administrative decision by the defendants, the United States Forest Service ("Forest Service") and Steve Parsons, District Ranger, who approved the Alba Sale. Krichbaum alleges that the defendants' decision to permit the salvage sale in the George Washington National Forest: (1) violated Forest Service regulations promulgated under the National Environmental Policy Act ("NAPA"), 42 U.S.C. § 4321 *et seq.,* and (2) conflicts with the Forest's Final Revised Land and Resource Management Plan ("Revised Plan"), which was prepared under the guidelines set forth in the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq .*

More specifically, Krichbaum alleges that the defendants:

---

**1.** Stated another way, the Fourth Circuit has instructed:

... The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. Always, of course, the public interest should be considered.

*Blackwelder,* 550 F.2d at 196.

**2.** Of course, the court does not pass on the parties' cross-motions for summary judgment at this time. Those motions now are pending before the United States Magistrate Judge to make proposed findings of fact and a recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B). Nevertheless, a recitation of the factual background is necessary because that background frames the parties' arguments for and against the injunctive relief at issue and is particularly relevant to the "likelihood of success on the merits" element of the *Blackwelder* test.

a. improperly applied a categorical exclusion ("CE"), which allowed them to avoid doing an Environmental Assessment ("EA") of the salvage site area, by ignoring the presence of a municipal watershed in violation of the Forest Service's regulations under NAPA;

b. improperly applied a CE which allows timber harvests removing 1 million board feet or less of timber for salvage purposes, or 250,000 board feet for non-salvage sales, because the Alba Sale would remove too much undamaged timber;

c. approved the Alba Sale in violation of the Revised Plan because the proposed salvage sale will not meet the visual quality standards under the Revised Plan;

d. approved the Alba Sale in violation of the Revised Plan by proposing a salvage sale that is in reality an "even-aged" timber cut, rather than an uneven-aged one;

e. failed to survey adequately the area for threatened, endangered, and sensitive animal and plant species;

f. failed to classify properly the salvage area as being suitable for timber production; and

g. failed to assess adequately whether the proposed sale would significantly affect riparian areas.

*See* Complaint at ¶¶ 15–27.

In 1995, the Alba Sale area was defoliated by gypsy moths. Pursuant to the Revised Forest Plan, the defendants assessed the area to see how best to prevent tree mortality and suppress the gypsy moth population. In July 1996, the defendant Forest Service surveyed the area where this occurred, known as Stand 4,[3] and found that: fifty percent (50%) of the white oak were dead and most of the remaining white oak were damaged; most of the scarlet oak had heart rot and are over-mature, with ten percent to fifteen percent (10% – 15%) of those trees dead and many more expected to die within two years; ten percent (10%) of the chestnut oak were dead; and the white pines in the area were unaffected. Administrative Record ("AR") Tabs 23, 24, and 26.

On August 5, 1996, the District Ranger proposed a salvage sale for the twenty (20) acres most affected by the defoliation. AR Tab 24. A notice of the proposed sale was sent to various State agencies, organizations, and persons (including Mr. Krichbaum). AR Tab 25. On August 9, 1996, a Forest Service landscape architect also inspected Stand 4, and determined that a careful harvest of trees would improve the scenic beauty of the damaged area and would meet the Forest's long-term visual quality goals. On September 3, 1996, public comments regarding the proposed sale were solicited, including those from plaintiff. AR Tabs 31, 32, 33.

On September 24, 1996, a zone hydrologist determined that, although the proposed sale is located in the North River watershed, it would not have a significant impact on the water quality, water yield, soil productivity, other uses of the North River or other area streams or lakes. The hydrologist also found that the Alba Sale area was outside the flood plains, wetlands, and other riparian areas, and that the soils and "slope class" for the area were similar to areas where two earlier timber sales had had no significant effects on water quality, yield, or soil productivity. AR Tabs 35, 21. A biological evaluation was done on October 4, 1996, which found no threatened or endangered plant or animal species. AR Tab 36.

Under statutory and regulatory procedures, the Forest Service normally must conduct an Environmental Assessment ("EA") to determine whether the proposed project would have significant environmental effects. If, after conducting an EA, the Forest Service makes a "finding of no significant impact" ("FONSI"), then a more detailed Environmental Impact Statement ("EIS") is not necessary. 40 C.F.R. § 1501.4(e). If, based on the EA, the Forest Service determines that the action would have a significant environmental impact, under NAPA the Forest

---

3. For administrative purposes, the Forest is divided into 18 management areas ("MA's"), which are further divided into compartments (1,000–1,500 acres each) and stands (10–40 acres each). The Alba Sale is to occur in MA 13. Compartment 451. Stand 4. AR Tab 23.

Service (or any agency) must conduct an environmental impact statement ("EIS") to determine further the environmental impact of the action. 42 U.S.C. § 4223(2)(C).

NAPA, however, also allows agencies to adopt "categorical exclusions" ("CE")[4] that exempt projects from the EA and EIS requirements. If a proposed action fits within a CE, neither an EIS or EA is needed. 40 C.F.R. § 1508.4. If an "extraordinary circumstance" exists,[5] then a proposed project cannot be placed in a CE and an EA is required. *See* Forestry Service Handbook ("FSH") 1909.15, § 30.3.

Under Forest Service regulations, FSH 1909.15, §§ 31.1(b) or 31.2, a project qualifies for a CE if it involves: (1) timber harvests removing not more than 250,000 board feet of merchantable wood; or (2) salvage logging removing not more than 1,000,000 board feet of merchantable wood. Under this second, 1,000,000 board feet exception, the Forest Service concluded that the Salvage Project constituted a CE, and so did not perform an EA or an EIS. The Forest Service also contends that the Project qualifies under the 250,000 board feet exemption for non-sales.

Much of the underlying case hinges on whether this decision of the Forest Service was permissible, and whether the Alba Sale project is consistent with the Revised Plan. The parties have briefed and argued the issue in relation to their cross-motions for summary judgment now pending before the Magistrate Judge. At the appropriate time, the Magistrate Judge will issue a recommended disposition of the cross-motions which this court will review *de novo*[6] in reaching the merits of the case.

For now, the court mentions the final portion of the case's factual and procedural

history only because it is relevant to Krichbaum's motion for injunctive relief. On October 17, 1996, the District Ranger decided to implement the salvage sale. A copy of his Decision Memorandum was mailed to the plaintiff and a notice of the decision was published in the local newspaper. AR Tabs 39, 40. Mr. Krichbaum took an administrative appeal from the District Ranger's decision. AR Tab 41. On January 11, 1997, the Regional Forester, acting on behalf of the Forest Service, affirmed the District Ranger's decision after carefully considering *and* responding to plaintiffs comments. *See* AR Tab 44. The Forest Service awarded the timber harvesting contract, surveyed the site again in May 1997, and scheduled the harvesting to begin in late 1997, with an estimated ninety-four and nine-tenths percent (94.9%) of the cut timber coming from dead or damaged trees. AR Tabs 47, 48.

Mr. Krichbaum filed his Complaint on April 30, 1997, requesting judicial review of the administrative decision. On December 31, 1997, the defendants filed a "Notice of Intent" with the court stating that logging operations in the Alba Sale project area would commence on or about January 5, 1998. Mr. Krichbaum seeks the instant injunctive relief to block this logging.

### III. *Blackwelder's* "Balance of Harms" Test

#### A. Likelihood of Success on the Merits [7]

Under the APA, a plaintiff's challenge to an administrative agency's actions can succeed only if the actions are deemed to be "arbitrary and capricious," 5 U.S.C.

---

**4.** A CE is defined as: "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted for a Federal agency ... and for which, therefore, neither an environmental assessment or [EIS] is required." 40 C.F.R. § 1508.4.

**5.** Extraordinary circumstances are "[c]onditions associated with a normally excluded action that are identified during scoping [initial assessment of the area] as potentially having effects which

may significantly affect the environment." *Forestry Service Handbook* 1909.15, § 30.5.

**6.** *Orpiano v. Johnson,* 687 F.2d 44, 48 (4th Cir. 1982).

**7.** The court takes up this element of the *Blackwelder* test first as did Chief Judge Wilson in *Krichbaum v. United States Forest Service, et al.,* No. 96–1000–R, Memorandum Opinion at 2 (W.D.Va. October 8, 1997) (citing *Long v. Robinson,* 432 F.2d 977, 979 (4th Cir.1970)).

§§ 706(2)(A) and 706(2)(C),[8] or is erroneous under the agency's own regulations. Furthermore, an agency's actions are presumed to be correct and the court will give deference to the agency's "expertise and judgment." *Sierra Club v. Robertson*, 810 F.Supp. 1021, 1025 (W.D.Ark.1992) (citations omitted), *aff'd*, 28 F.3d 753 (8th Cir.1994). The Fourth Circuit has recognized this standard of review, as has this court. *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 61 (4th Cir.1991), *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992); *Virginia Agr. Growers Ass'n v. Donovan*, 774 F.2d 89, 92–93 (4th Cir.1985); *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1110 (W.D.Va. 1994), *aff'd*, 61 F.3d 900 (4th Cir.1995).

Here, as in any other case challenging the actions of an administrative agency, it is important to remember that the question before the court is whether the decision of the administrative agency is in fact "arbitrary and capricious" or erroneous under the agency's regulations, rather than whether the TRO movant disagrees with certain of the factual statements contained in the administrative record.

In this case, the court avoids some of the dangers cogently explicated by Judge Wilkinson in *Hughes Network Systems, supra*, 17 F.3d at 693 in that the court has before it the full administrative record submitted with the cross-motions for summary judgment filed by the parties.[9]

■ In looking at that administrative record, it is apparent that there has been a detailed consideration by the Forest Service

of the various factors raised in Krichbaum's motion for summary judgment and in his motion for a TRO. One particular example is illustrative of the attention paid to the various elements by the Forest Service. The question of the visual characteristics of the plot in question after removal of the salvaged trees was dealt with by a landscape architect, whose conclusion was that the visual characteristics of the parcel (Stand 4) would be improved by the removal of the dead, dying or damaged trees. While Mr. Krichbaum, the movant in this matter, disagrees with that conclusion, it nonetheless stands unchallenged in the administrative record. The Forest Service is entitled to rely on that information as it apparently did in approving the Alba Sale. Though the movant disagrees, careful consideration of the report by the landscape architect, and its acceptance by the Forest Service, indicates the conclusion lacked that "arbitrary and capricious" nature essential to any likely meritorious challenge to the actions of the defendants.[10]

## B. Irreparable Harm to Plaintiff if Injunctive Relief Denied

■ The *Blackwelder* test demands that this court consider whether Mr. Krichbaum will suffer irreparable harm if he does not receive the injunctive relief he requests. The Fourth Circuit has deemed "irreparable harm" by what it emphatically is not, stating that "[m]ere injuries, however substantial ... are not enough." *Hughes Network Systems, supra*, 17 F.3d at 694 (citing *Sampson*

---

8. The United States Supreme Court has stated that the "arbitrary and capricious" standard is akin to the "reasonableness" standard applicable to certain other types of district court rulings. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

9. In the situation of an incomplete record, Judge Wilkinson noted that "... granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. '[T]he danger of a mistake' in this setting 'is substantial.'" *Hughes Network Systems*, 17 F.3d at 693 (citing and quoting *American Hosp. Supply Corp. v. Hospital Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir.1986)).

10. No particular purpose is served by citing at length the attention paid by the Forest Service to each of the other of its conclusions disagreed with by the movant. The cited instance of the landscape architect's report is sufficient to demonstrate the care taken by the Forest Service in connection with the other arguments of the movant as to these various other elements. As well, the zone hydrologist's determination that the Alba Sale would not threaten the North River watershed and the biological evaluation's finding of no threatened or endangered species in the area both demonstrate the defendants' thoroughness in addressing the movant's concerns.

*v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)) (other citations omitted).

Mr. Krichbaum cites the following as harms he will suffer if his TRO motion is denied and the Alba Sale logging allowed to proceed: (1) trees will be harvested from approximately twenty (20) acres of the National Forest altering the affected area's appearance and habitat permanently; (2) the affected area's recreational uses (*e.g.,* hiking, bird-watching, etc.) will be diminished; (3) the North River watershed, which the plaintiff uses, may be affected by the salvage operation; and (4) endangered species of plant and animal life possibly living in the affected area may be threatened by the logging.

In a well-reasoned passage of *Krichbaum v. U.S. Forest Service, supra,*[11] Chief Judge Wilson concluded that while concerns such as the movant's may amount to harms, such concerns must be viewed in a broader context. *Krichbaum,* at 589. Consistent with the Fourth Circuit's admonition in *Hughes Network Systems* that irreparable harm involves more than "mere injuries," the Chief Judge addressed the movant's similar anxieties about timber sales in the Hematite area of the National Forest:

> [t]he proper inquiry is whether the area and the forest *as a whole* would be harmed by the Forest Service's overall management plan.... The Forest Service, in its initial ruling on the matter, found that the proposed timber sale would not have a detrimental effect on the overall well-being of the ... area or the George Washington National Forest. The Forest Service specifically found that the timber sale did not involve old growth forest, that there would be no significant effect on threatened[,] endangered, and sensitive species.... In effect, the Forest Service determined that the proposed timber sale would not irreparably harm the .... area or the forest *as a whole.*

*Id.* (emphases added).

■ As a whole, even after the Alba Sale, the Mr. Krichbaum will continue be free to use and enjoy the George Washington National Forest's scenic, recreational, and biological offerings. At most, only trees—the vast majority of which are dead, dying or damaged—on twenty of the Forest's millions of acres will be harvested. Again, the administrative agency has determined that the salvage operation poses no threat to area watersheds or threatened species. Having made these scientific findings, "... the Forest Service entitled to substantial deference on scientific questions within its area of technical expertise." *Krichbaum v. U.S. Forest Service, et al.,* 973 F.Supp. 585, 594 (W.D.Va. 1997) (Wilson, C.J.) (citing *Sierra Club v. Marita,* 46 F.3d 606, 621 (7th Cir.1995)).

Thus, the court finds that Mr. Krichbaum will not suffer irreparable harm if his present TRO motion is denied.

### C. Harm to Defendants if Injunctive Relief Granted

The defendants in this case have undertaken a careful and detailed consideration of the Alba Sale's total impact on the National Forest, as discussed *supra.* Acting in reliance on the affirmance of the Alba Sale plan of the District Ranger by the Regional Forester in Krichbaum's administrative appeal, the Forest Service awarded a contract to a small logging concern.

■ Clearly, if the court were to grant the motion for a TRO the third party logging contractor and his employees would be financially harmed. The contractor's preparation to harvest timber would have to be interrupted or discontinued altogether at great cost and inconvenience. More importantly, however, the defendants themselves would be economically harmed by granting the movant any injunctive relief. The defendants have adduced evidence that the salvage sale would yield the highest timber prices in winter, with prices steadily declining through spring and summer. Thus, for the defendants, as with the third party logging company, any forced delay to beginning the Alba project in

---

11. The court does not cite this or another unpublished Memorandum Opinion, *infra,* from *Krichbaum v. U.S. Forest Service, et al.,* No. 96–1000–R for their precedential value, but rather because it finds the Chief Judge's reasoning therein important and convincing on several points the movant raises in this case.

(or about) January 1998 would work to their economic detriment.

The court, therefore, fads that balancing the respective hardships to Mr. Krichbaum and to the defendants resulting from a denial or grant of the TRO, respectively, yields the conclusion that the defendants would bear the heavier blow.

### D.   Public Interest

Simply stated, the public interest would not be served by granting the movant injunctive relief on a claim with scant likelihood of ultimate success.   Again, in this case, the standard of review of an administrative agency's decision is the "arbitrary and capricious" standard;  the public interest, as expressed by Congress when it enacted the Administrative Procedure Act, 5 U.S.C. § 706, affords the Federal Judiciary minimal powers of review of any decision of an administrative agency.   Thus, that same public interest would not be served were the court to grant the movant injunctive relief now, only to reverse itself later based on full consideration of the merits of the underlying case.

### IV.

Because in this case all four *Blackwelder* factors cut sharply in the defendants' favor, the court will deny plaintiff's motion for a TRO and a preliminary injunction.   An appropriate Order shall issue this day.